IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LISA SIMPSON,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Civil No. 10-394-GPM-CJP** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge G. Patrick

Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Lisa Simpson seeks judicial review of

the final agency decision denying her Supplemental Security Income (SSI) pursuant to **42 U.S.C.**

**§ 423**.[1]

## Procedural History

Plaintiff filed an application for SSI on October 31, 2005, alleging disability as of April

13, 1998, which was the date on which a previous application for disability benefits was denied.

(Tr. 118-119). The application was denied initially and on reconsideration. After a hearing,

---

[1]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Administrative Law Judge (ALJ) Sally C. Reason denied the application on November 19, 2008. (Tr. 11-26). Plaintiff's request for review was denied by the Appeals Council, and the November 19, 2008, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint.

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff.

## 1. Plaintiff's Testimony

The evidentiary hearing took place on October 31, 2008. Plaintiff was represented at the hearing by counsel. (Tr. 33-34).

Ms. Simpson was 48 years old at the time of the hearing. She had a 7th grade education. She had done essentially no work in the past 15 years, except for 1 day of factory work. (Tr. 35). She was unable to work because of fibromyalgia, depression, anxiety and migraine headaches. She has pain all over her body. She has migraines 2 or 3 times a week. With a migraine, she is sick to her stomach and sensitive to light and sound. She takes Imitrix for migraines. After she takes the medicine, the headache lasts for a couple of hours, but then she has to lay down for the rest of the day to get over it. The fibromyalgia causes her to feel weak and fatigued. (Tr. 36-39).

She has been on some kind of medication for depression for 20 years, but recently started seeing a psychiatrist, Dr. Gilbert. She also sees a counselor every 2 weeks. (Tr. 42-43). Because of her depression, she doesn't feel like doing anything. (Tr. 45). She does not even get dressed 3 or 4 days a week. (Tr. 46).

She lives with her husband. She described a typical day, testifying that she does almost nothing. She can walk only a couple of blocks. She can lift 10 pounds. She has to lay down a lot during the day. (Tr. 49-50). She goes to the grocery store. She leaves her house maybe twice a week. (Tr. 51). She drove herself to the hearing. (Tr. 52).

## 2. Vocational Expert

Gregory Jones testified as a vocational expert. Plaintiff had no objections to his qualifications. (Tr. 34).

Asked to assume a person who could perform medium work but was limited to simple tasks at a routine pace, the VE testified that she could perform jobs such as hand packager (1,000 in the state of Illinois) and "cleaner II" (300 in the state of Illinois) at the medium level. At the light exertional level, she could perform jobs such as housekeeping cleaner (900 in the state of Illinois). (Tr. 53).

## 3. Records of Treatment and Evaluations

Ms. Simpson has received on-going treatment from Dr. Nanni of Carterville Family Practice. The records from this provider are located at two places. Records from November, 2004, through April 28, 2006, are at Tr. 233-282. Records from March 8, 2004, through August 25, 2008, are located at Tr. 633-690. At some point in 2006, Dr. Nanni diagnosed fibromyalgia.

On various visits during 2005, Ms. Simpson was seen for complaints of anxiety and she was prescribed Wellbutrin and Paxil. (Tr. 243, 252). On April 1, 2005, Dr. Nanni biopsied some skin lesions from her back, noting that she had a history of infiltrating basal cell cancer on her chest. (Tr. 250). Six moles were later removed after the biopsy results showed atypical cells. (Tr. 246). She complained of headache and abdominal pain on various dates. (Tr. 239,

244, 247).  On November 28, 2005, she complained of having a headache all weekend.  Dr. Nanni noted that she was photophobic, and diagnosed migraine.  (Tr. 235).  On December 7, 2005, she was seen for follow-up for several conditions, including migraine headaches and abdominal pain.  She was noted to be anxious.  Elavil was re-started. (Tr. 234).

On January 20, 2006, Ms. Simpson complained of tenderness in her joints and worsening facial rash.  Dr. Nanni considered a provisional diagnosis of connective tissue disorder, perhaps lupus.  (Tr. 270).  On February 3, 2006, Ms. Simpson saw Dr. Nanni for complaints of a painful facial rash and pain in the keloid scars on her back.  Dr. Nanni noted that she had anxiety disorder.  (Tr. 269).  On February 10, 2006, a biopsy of the facial rash indicated that it was rosacea, and not lupus.  (Tr. 300).  On February 17, 2006, plaintiff reported that her arms and legs felt numb and tingly.  Dr. Nanni diagnosed paresthesias, and prescribed Neurontin.  (Tr. 279).  On April 19, 2006, she complained of headache and blurred vision.  The diagnosis was tension headache.  (Tr. 275).  On April 28, 2006, Dr. Nanni again injected the keloid scars on her back.  She noted that plaintiff had tight muscles in her neck and upper back, with faint pallor of her fingertips.  She was "very anxious."  (Tr. 274).

The second set of Dr. Nanni's records contain "progress notes" from 2006 and 2007. These notes consist mostly of staff entries regarding phone calls and scheduling of appointments. The entry for most visits is just a stamp which reads "see patient care form."  (Tr. 645-664).  The patient care form is the form on which Dr. Nanni recorded her treatment notes.  The administrative transcript does not include a patient care form for every date on which there is a staff progress note.  At some point in 2006, Dr. Nanni evidently diagnosed fibromyalgia, as a progress note from October, 2006, states the reason for appointment as "cystitis/fibromyalgia."

-4-

Plaintiff did not show up for that appointment. (Tr. 649). She was seen on November 24, 2006, December 18, 2006, and on various dates in the first half of 2007, according to the progress notes. (Tr. 650 -651). However, Dr. Nanni's patient care forms for those visits are not in the record.

The patient care forms pick up again with a visit on August 29, 2007. Plaintiff complained that her joints were more painful and her hands and feet were numb and tingly. The diagnoses were hypertension, anxiety and fibromyalgia. (Tr. 665-666). The records continue to reflect those diagnoses, along with complaints such as migraines, pain, anxiety, numbness in hands and feet and shortness of breath through August, 2008. (Tr. 665-690).

Physical therapy notes from February, 2008, indicate that Dr. Nanni referred plaintiff for therapy after 4 months of worsening shoulder pain. She had decreased range of motion and positive trigger points. She was noted to have fibromyalgia and migraines. (Tr. 420-421).

On December 18, 2006, Dr. Nanni completed a Fibromyalgia RFC Questionnaire in which she indicated that she had seen Ms. Simpson every 1 to 3 months for the past 3 years. (Tr. 362-365). Among the symptoms, Dr. Nanni checked "multiple tender points," "chronic fatigue" and "frequent, severe headaches." (362). She stated that plaintiff met the American College of Rheumatology criteria for fibromyalgia. (Tr. 362, question number 2). Dr. Nanni assessed a very limited RFC in that she said that plaintiff was unable to tolerate the stress of even a low stress job, could walk only 1-2 blocks, could sit for only 30 minutes at a time and a total of 2 hours out of the day, could stand for 15 minutes at a time and stand/walk for less than 2 hours total. She could rarely lift 10 pounds, and never lift any greater weight. (Tr. 364). She also assessed significant postural and manipulative limitations, and predicted that plaintiff would

miss more than 4 days a month due to her symptoms. (Tr. 365).

Dr. Nanni completed another such form on April 3, 2008, with similar answers. (Tr. 423-426). This form indicated that Ms. Simpson had also been diagnosed with depression, anxiety disorder and migraines. (Tr. 423-426).

Ms. Simpson began receiving mental health treatment at Franklin-Williamson Human Services on June 13, 2006. On initial assessment, she was diagnosed with major depression, generalized anxiety disorder and post traumatic stress disorder. Individual therapy/counseling was recommended. (Tr. 504-547). The last assessment in the records is from July, 2008. The diagnoses are the same. It was noted that Ms. Simpson had numerous physical health conditions, including fibromyalgia and chronic pain. She had on-going grief issues related to the death of her brother and to her mother having cancer. She also had financial stress and inability to afford medications. On mental status exam, her speech was clear and her thought content and perception were unremarkable. Her thought process was logical. Her mood was depressed and her behavior was withdrawn. She had impairment of attention and concentration. Her insight and judgment were rated as fair. (Tr. 614-642).

Plaintiff's medication was managed by psychiatrists while she was undergoing counseling. The psychiatric progress notes are located at TR. 411-418 and Tr. 691-698. On June 23, 2007, she had been on Elavil for 2 weeks. Her sleep was better, but she had some nausea and sedation in the morning. She was still anxious and had headaches for the past week. The diagnosis was anxiety and ADHD- provisional. (Tr. 412). On July 24, 2007, she reported that she felt shaky and nervous and that she constantly worried about everything. She still had nausea and poor concentration. She was instructed to discontinue Prozac and to continue Elavil

and her other medications. (Tr. 413-414). Her medications were again adjusted on October 3, 2007, as she was still having nausea and was irritable and depressed. (Tr. 417-418). In September, 2008, she noted longstanding irritability and that she had felt better at first on Lamictal, but that faded. She was instructed to increase her dosage of Lamictal. (Tr. 692-693). However, she was unable to tolerate the increased dosage, as it caused her GI upset and increased anxiety. She was instructed to decrease Lamictal and to add Lexapro. (Tr. 694-695). On October 13, 2008, it was noted that she was getting limited benefits from medications and that there was duplication of some medications. She had anxiety and somatization. Her migraine headaches were treated with Tegretal and Imitrix. The doctor indicated that her medications needed to be reassessed. (Tr. 696-697).

A consultative physical examination was performed by Shimin Cao, M.D., on December 20, 2005. Her complaints were severe depression and generalized ache. She said that she had depression for 20 years, but it was getting worse. She felt hopeless and sad. She was taking a number of medications, including Klonopin, Paxil and Wellbutrin.[2] She also said that she had generalized pain in her joints and bones for more than a year and a half. She had been prescribed Ibuprofen 800 mg and Tylenol with Codeine. The findings on physical exam were essentially unremarkable. She had no evidence of redness, warmth, thickening or effusion of the joints of her arms or legs. Grip strength and muscle strength of the arms were normal. Her ability to perform both fine and gross manipulation was normal. She had no limitation of motion of the arms or legs. There was no paraspinal muscle spasm or atrophy. Her gait was normal. She had

---

[2]Klonopin is used to treat seizure disorders and to relieve panic attacks. Paxil and Wellbutrin are used to treat depression. www.ncbi.nlm.nih.gov/pubmedhealth, accessed on April 11, 2011.

no difficulty walking on toes or heels, squatting and rising, or hopping on one leg. Dr. Cao opined that she was able to sit, stand, walk, carry and lift without limitation. (Tr. 295-299).

James S. Peterson, Ph.D, performed a consultative psychological examination on January 24, 2006. He reviewed some medical notes which indicated a diagnosis of anxiety. She was taking Paxil and Wellbutrin. She reported that her husband received social security benefits due to arthritis. She was last employed in 1988. She completed the 7th grade and did not have a GED. She claimed a number of physical symptoms, including achiness and swelling in her bones and joints, and chronic headaches. She said that she had ongoing depression which had gotten worse since she had a hysterectomy in 2005. On exam, she was alert and lucid. She was oriented to time, place and person. Her long term and intermediate memory were intact. The diagnosis was mood disorder due to a general medical condition. (Tr. 291-294).

A state agency physician signed a form on February 14, 2006, indicating that he agreed with an adjudicator's proposed decision to deny the claim because plaintiff's impairments were nonsevere. The primary diagnosis indicated by the adjudicator was GERD, with no secondary diagnosis. (Tr. 301-302). A second state agency physician agreed with this assessment on May 26, 2006. (Tr. 355-356). State agency psychologist Margaret Wharton signed off on a similar form, stating that she agreed with the assessment of February 12, 2006. (Tr. 353-354). However, the record does not contain an assessment dated February 12, 2006. It is possible that Dr. Wharton was actually referring to the assessment dated February 14, 2006.

On May 14, 2008, on the referral of psychiatrist Dr. Gilbert-Johnson, plaintiff was examined by a neurologist, Samineh Khosrowshahi, M.D. This doctor noted a past medical history of fibromyalgia, depression, anxiety, neck pain, headaches and bilateral shoulder pain.

Plaintiff told Dr. Khosrowshahi that she experienced pain throughout her whole body, with daily mild headaches. She also experienced occasional sharp headaches with photophobia, which were helped by Imitrix. (Tr. 427). Ms. Simpson also complained of a number of other symptoms, including fatigue, generalized weakness, poor memory and joint pain. (Tr. 428). The results of the neurological examination were normal, except for reduced deep tendon reflexes. Dr. Khosrowshahi indicated that he would not prescribe any medications as she was "already taking many medications." He also noted that her "stressors are playing a big factor causing current pain and syndromes." (Tr. 429).

### Applicable Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5)

whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the issue for this Court is not whether Ms. Simpson was, in fact, disabled during the relevant time period.  Rather, this Court must determine whether ALJ Reason's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing** *Diaz v. Chater*, **55 F.3d 300, 306 (7th  Cir.1995)).**

In reviewing for substantial evidence, this Court uses the Supreme Court's definition, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, **402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  Further, the entire administrative record is taken into consideration, but this court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997).**

## Analysis

Here, the ALJ followed the five step analysis. She concluded that plaintiff had not worked since the alleged onset date, and that she does have severe impairments of fibromyalgia, depression and anxiety. (Tr. 13-17). The ALJ indicated that the evidence of fibromyalgia was weak, and that she was giving plaintiff "considerable benefit of the doubt in finding that her alleged fibromyalgia is severe." (Tr. 24). She concluded that these impairments do not meet or equal a listed impairment. (Tr. 17-19). Plaintiff does not challenge the finding that her condition does not meet or equal a listed impairment.[3]

The ALJ found that plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were "not credible to the extent that they are inconsistent with the [RFC] assessment." (Tr. 21).

In assessing the opinion evidence, the ALJ declined to give Dr. Nanni's RFC assessment and diagnoses "great weight." She concluded that the objective evidence was not inconsistent with the findings of Dr. Cao's consultative exam and with Dr. Khosrowshahi's exam. The ALJ assessed Ms. Simpson as having the RFC to do medium work, that is, to lift 25 pounds frequently and 50 pounds occasionally, and to stand and walk 6 out of 8 hours. The ALJ also found she was limited by her mental impairment to simple, routine tasks. Based on the testimony of the VE, the ALJ concluded that plaintiff was able to do the work of hand packager and cleaner II. (Tr. 25-26).

Plaintiff's first point is that ALJ Reason erred in rejecting the opinions of Dr Nanni. The ALJ said that she declined to give "great weight" to Dr. Nanni's functional assessment and

---

[3]There is no listing for fibromyalgia.

diagnoses because of perceived omissions in medically acceptable diagnostic practice and evidentiary support. (Tr. 24). The ALJ said that she relied instead on the progress notes of Dr. Nanni and "the other treating source providers." (Tr. 24).

It is unclear what weight, if any, the ALJ afforded to Dr. Nanni's opinions. She simply stated that she did not give them "great weight." This was error. If an ALJ determines not to give controlling weight to a treating doctor's opinion, she must then consider the factors set out in 20 C.F.R. §404.1527(d)(2) and determine what weight to give the opinion. ***Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)**.

Further, the ALJ's decision indicates a misunderstanding of the nature of fibromyalgia, which the Seventh Circuit has described as "a common, but elusive and mysterious, disease." ***Sarchet v. Chater*, 78 F. 3d 305, 306 (7th Cir. 1996)**. The cause or causes of the disease are unknown, as is the cure, and "of greatest importance to disability law, its symptoms are entirely subjective." *Ibid*. There are no laboratory tests to detect the disease or to measure its severity. One sign which points to fibromyalgia is the presence of trigger, or tender, points. As the Seventh Circuit explained, "The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and ... multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Ibid.*

The ALJ discounted the opinions expressed by Dr. Nanni in two Fibromyalgia RFC Questionnaires because there was no evidence of tender point testing and no mention of swelling in her treatment notes. This was error. First, the record does not even include Dr. Nanni's treatment notes from late 2006 and the first half of 2007, which is, unfortunately, the period of

time when the diagnosis of fibromyalgia was first made. Secondly, Dr. Nanni's treatment notes do, in fact, document muscle pain and tightness. See, Tr. 235, 236, 270, 274, 676. An LPN in Dr. Nanni's office documented pain in the trapezius and suprascapular areas. Tr. 673. Dr. Nanni referred plaintiff for physical therapy in February, 2008, after 4 months of worsening shoulder pain, and the physical therapist documented positive trigger points. (Tr. 420-421).

The ALJ was also off base in discounting Dr. Nanni's opinion on the grounds that there was no documentation of swelling, since swelling is not a symptom of fibromyalgia. ***Sarchet*, 78 F.3d at 307.** Likewise, her statement that Dr. Nanni's records do not contain "testing noted in the actual treating source progress notes" is not a valid reason for discounting Dr. Nanni's opinions, since there is no test for fibromyalgia.

The ALJ also felt that the validity of Dr. Nanni's opinion was undermined by the fact that Dr. Nanni diagnosed skin cancer, but the ALJ believed that the biopsy results in the record were all benign. The ALJ was mistaken. The record does, in fact, contain biopsy results positive for skin cancer. See, Tr. 370-371.

In sum, the ALJ rejected Dr. Nanni's opinions based on a combination of a misunderstanding of the nature of fibromyalgia and of the medical evidence. These errors require remand. See, ***Sarchet*, 78 F.3d at 308-309.**

Plaintiff also takes issue with the ALJ's credibility determination. ALJ Reason found that Ms. Simpson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. 21).

The Seventh Circuit criticized similar language in ***Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010)**, stating that "It is not only boilerplate; it is meaningless boilerplate." As in ***Parker***, the ALJ's statement is meaningless because it does not communicate what weight she actually gave the testimony.

It is also problematic that the ALJ rejected plaintiff's testimony to the extent that it did not mesh with her findings as to RFC. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." ***Brindisi v. Barnhart*, 315 F.3d 783, 787-788 (7th Cir. 2003)**.

These errors are compounded by the fact that the ALJ again misstated the record in evaluating Ms. Simpson's testimony. For instance, the ALJ said that plaintiff claimed she had cancer when there was no evidence of same in the records. This is incorrect. See, Tr. 370-371. The ALJ said that plaintiff claimed to have migraine headaches, but there was no evidence of photophobia or other "typical" manifestations of migraine in the records. In fact, headache accompanied by photophobia was noted in the record at Tr. 235 and 427, and headache accompanied by blurred vision was noted at Tr. 237, 240, 275, 589. The ALJ incorrectly said that plaintiff testified that she had been diagnosed with fibromyalgia 5 years ago, when, according to the ALJ, there was no such diagnosis before 2008. In fact, Ms. Simpson testified that she had been diagnosed with fibromyalgia about 3 years before the hearing on October 31, 2008. (Tr. 37). Dr. Nanni's records reflect a diagnosis of fibromyalgia as early as October, 2006, and Dr. Nanni's first Fibromyalgia RFC Questionnaire was dated December 18, 2006.

The ALJ's decision is the product of legal errors and is not supported by substantial evidence. This case must be remanded for reconsideration. It should be noted that this Court is not making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. **See, *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

<u>**Recommendation**</u>

This Court recommends that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **May 2, 2011.**

**Submitted: April 15, 2011.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**